UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RIFKIN SCRAP IRON AND METAL COMPANY,
other West Branch Steel,

        Plaintiff,

v.

OGEMAW COUNTY, ALLEN DEROCHER,

        Defendants.

Case Number 06-12351-BC
Honorable Thomas L. Ludington

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,
DISMISSING WITH PREJUDICE COUNT V OF PLAINTIFF'S COMPLAINT,
DENYING DEFENDANTS' SUPPLEMENTAL MOTION
FOR SUMMARY JUDGMENT,
DIRECTING PLAINTIFF TO AMEND COMPLAINT,
AND AMENDING CASE MANAGEMENT AND SCHEDULING ORDER**

Plaintiff Rifkin Scrap Iron and Metal Company filed suit against Defendants Ogemaw County (county) and Allen Derocher, Defendant county's zoning administrator, alleging, *inter alia*, violations of due process and equal protection under 42 U.S.C. § 1983, and a takings claim under the Fifth Amendment. Defendants filed a motion for summary judgment under Federal Rule of Civil Procedure 56, and the Court held a hearing on that motion on November 6, 2007. In an order on November 8, 2007, the Court directed supplemental briefing, which the parties timely provided. On March 25, 2008, Defendants filed a supplemental motion for summary judgment, arguing a lack of subject matter jurisdiction for failure to exhaust state court remedies.

In brief, Plaintiff owns and operates a metal scrap yard. Plaintiff alleges that Defendants, who previously had zoning authority over the site of Plaintiff's operation, took actions that forced

it, ultimately, to relocate to another site at significant cost. The current zoning authority, West Branch Township (township), also took separate actions that affected Plaintiff's decision to move to a new site, but the township is not a party to this litigation. Notwithstanding a variety of proceedings over some time, it appears that Plaintiff's takings claims derive from the absence of review of a stop-work order issued by Defendant county and Defendant county's denial of a vehicle dealer's license. Due to the complexity of the law involving allegations of regulatory takings and the ad hoc nature of judicial determinations to such challenges, the Court will commence its discussion with an overview of the law and then turn to the particular circumstances at issue here.

I.

The complexity of this area of law has been noted by a commentator:

> In its decisions on property use regulations and the extent of permissible government impairment of the value of private property interests the [Supreme] Court has issued rulings which follow no clear theoretical guidelines. The Supreme Court's decisions in "taking" issues may properly be viewed as a "crazy quilt pattern" of rulings.

Ronald E. Rotunda, John E. Nowak, 2 Treatise on Constitutional Law: Substance and Procedure § 15.12(a)(vii) (4th ed. 2007) ("Rotunda"); *see also* John Harrison, "Substantive Due Process and the Constitutional Text," 83 Va. L. R. 493, 495 (1997) (expressing one commentator's view "that the textual pedigree of substantive due process has no definitive judicial articulation"); *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005) (acknowledging that Supreme Court "regulatory takings jurisprudence cannot be characterized as unified"). Despite a few per se rules, such as when the government physically occupies all of a property, no clear rules govern regulations that diminish but do not totally eliminate a property's value. Consequently, "a court must examine the Supreme Court decisions . . . in order to determine if any factors from those . . . decisions would be relevant to the ad hoc judgment that the court will have to make in that case." Rotunda at § 15.12(a)(vii).

By way of general overview, governmental actions that might suffice to support a taking claim break into six categories: (1) physical occupation of the property (if not a forfeiture or justified by emergency); (2) governmental transfer of a right to occupy or access property; (3) conditioning a permit for the use of property on granting a right of access to the government or the public; (4) damage to the property due to government action; (5) regulations, including zoning, that reduce the value of property to zero; and (6) regulations of property that unfairly and unjustly shift social costs to a limited group of property owners.[1]  *Id*. at § 15.12(a)(i).  As to the first and second categories, nothing in this record suggests that the government, i.e., Defendants, physically occupied or required a transfer of a right to occupy or access the property.  As to the third category, the factual record might support a claim that the *township* sought to condition a permit on particular factors and agreements from Plaintiff.  That scenario, however, cannot support a claim against Defendants.  As to the sixth category, Plaintiff has little developed any such theory, so the following discussion will focus on the fourth and fifth categories.

---

[1]The subsequent analysis does not address the Sixth Circuit's decision in *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1215-1216 (6th Cir. 1992), which pre-dates the Supreme Court's unanimous decision in *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005), in which it sought to narrow the range of takings theories available under its precedents.  In *Pearson*, the Sixth Circuit listed five types of claims based on purported zoning violations, in light of federal law.  As explained in more detail in *Eide v. Sarasota County*, 908 F.2d 716, 720-722 (11th Cir. 1990), which the Sixth Circuit cited with approval, those claims are as follows: (1) a just compensation takings claim, in which a zoning regulation applied to property amounts to a taking without compensation, with a remedy of just compensation; (2) a due process takings claim, in which applying a zoning regulation to the property amounts to a taking without due process of law, with a remedy of invalidating the zoning as applied; (3) arbitrary and capricious substantive due process claim, based on a plaintiff's assertion that (either on its face or as applied) that a zoning regulation is arbitrary or capricious because it does not bear a substantial relation to public health, safety, morals, or general welfare; (4) an equal protection claim, employing either strict scrutiny for a protected class or a rational basis test for economic discrimination; and (5) a procedural due process claim, which challenges a lack of notice and/or opportunity to be heard.

In the fourth case, which involves conditions placed on a permit, the condition on the permit must have a sufficient connection to a legitimate state interest and a rough proportionality must exist between the cost of the conditions and the benefits to the public. *See Dolan v. City of Tigard*, 512 U.S. 374, 385-386 (1994); Rotunda, § 15.12(a)(ii), (b)(vii).[2] In *Penn Central v. New York City*, 438 U.S. 104 (1978), the Supreme Court upheld a regulation that limited development of a landmark, after considering "the magnitude of [the] regulation's economic impact and the degree to which it interfere[d] with legitimate property interests." *Lingle*, 544 U.S. at 540. Later decisions tend to emphasize three factors in assessing alleged regulatory takings under *Penn Central*: (1) the economic effect of the regulation on a claimant; (2) the extent to which the regulation interferes with investment-backed expectations; and (3) the character of the government action, such as whether the action adjusts public benefits or is a physical invasion.

In the fifth case involving reduction of the value of property, under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992), a taking occurs if a regulation requires a propertyholder "to sacrifice *all* economically beneficial uses." This principle does not extend to encompass regulations that do not reach the point of requiring the propertyholder to leave the land economically idle.

In addition to the different manners in which a taking might occur, certain procedural requirements apply to bringing some such claims. The Supreme Court requires a plaintiff to pursue available state procedures for compensation for any allegedly improper deprivation of property before raising a takings claim. *Williamson County Regional Planning Comm'n v. Hamilton Bank*

---

[2] This test applies only to conditions placed on a development and does not extend to a denial of proceeding with development at all. *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999).

*of Johnson City*, 473 U.S. 172, 191-196 (1985). There, the Court prevented the plaintiff from pursuing a claim, where it had not pursued an available state law action for inverse condemnation and had not sought a variance. In *Nasierowski Brothers Investment Co. v. City of Sterling Heights*, 949 F.2d 890, 893-894 (6th Cir. 1991), the Sixth Circuit differentiated between a claim based on a diminution of property value, which requires a final judgment and exhaustion of administrative remedies to establish that loss, from a claim based on an alleged infirmity in the process itself. This latter type of claim "is instantly cognizable in federal court without requiring a final decision on a proposed development from the responsible municipal agency." *Id*. at 894.

II.

In light of the foregoing authority, the Court will review the facts as presented by the parties. Plaintiff is a business that purchases, transfers and sells recyclable metals. In 2002, Plaintiff purchased a 2.5 acre property not far from Highway M-76 in Ogemaw County and zoned B-3, highway business district. This property is located next to a mobile home park and other residential properties.

A.

On September 5, 2002, Plaintiff submitted an application for a special land use permit to operate as an open-air business as a transfer station for recyclable metals. The signatory to that application agreed to the following:

> I hereby certify and agree that all use for which this application is made will conform to the data and information submitted with this application and Ordinances affecting Ogemaw County, Michigan. It is further agreed that any deviation from the data submitted or the breach of any additional safeguards, conditions or requirements that the County Planning Commission may impose in granting this permit, shall constitute a violation of the Ogemaw County Zoning Ordinance and invalidate the permit granted.

*Application for Special Use Permit*, Sept. 5, 2002; Dft. Br., Ex. 1 [dkt #19-2].

According to meeting minutes, on November 26, 2002, the planning commission for Defendant county and Defendant DeRocher held a public hearing on Plaintiff's application. (Rather than rely on those minutes, Defendants seek to cite the Court to an unofficial transcript of the proceedings.[3]) Although not recited in the minutes, Defendants state that assurances were sought that the property would not be used as a junkyard, which allegedly (though Defendants provide no record citation) would require a separate zoning classification and a larger parcel of property.

On December 2, 2002, Defendant county's planning commission issued the special use permit, with a variety of conditions.[4] These conditions included requirements for fencing and for a tree perimeter, for blacktop on the surface of accesses to the highway, limits on the hours of operation (not to exceed 4:30 p.m. on weekdays), and dust control measures, such as use of a limestone base. Because the permit includes the application, *see* Pl. Am. Cplt., Ex. B, Defendants can accurately assert that the permit includes an obligation to abide by all terms of Defendant county's zoning ordinance (CZO) and to meet the conditions required for the permit's issuance, else Defendant county could invalidate the permit.

---

[3]A secretary at the Ogemaw County prosecutor's office, Michelle Williams, attests that she has accurately and completely transcribed a recording of that meeting. The transcript identifies the speakers, at best, by name, and the representative of Plaintiff is hard to identify. Also, one of the speakers is named John Williams, who may or may not have any relationship to the transcribing secretary.

[4]CZO § 19.1 [dkt #19-3], in relevant part, provides:

Special Land Uses are the those uses of land which are not essentially incompatible with uses permitted by a District, but possess characteristics or locational qualities which require individual review and discretion in order to avoid incompatibility with the character of the surrounding area, public services and facilities, and adjacent uses of land. . . .

In December 2003, apparently in response to a variety of complaints from Plaintiff's neighbors, Defendant Derocher drafted a memo regarding Plaintiff's special use permit. He stated that Plaintiff was not in compliance with its permit, in that it had not installed a limestone base to control dust, and recommended additional conditions on Plaintiff's permit, to be effective immediately, to avoid anticipated litigation.

According to Plaintiff's general manager, Jeffry Weinberg, about 85% of Plaintiff's intake collected in a large pile, which some of the exhibit photographs show exceeding the height of the privacy fence. Defendant county's former zoning administrator, James Briese, stated that the pile was sometimes as tall as a house. He also stated that he sometimes observed operations on the site at 7:45 a.m., rather than commencing at 8:00 a.m. Defendants also contend that Plaintiff violated the zoning ordinance's 50' roadside setback restrictions and created a safety risk when a long line of trucks waited on the highway shoulder in the morning. (Indeed, Plaintiff's general manager admitted that the site did not comply with setback requirements, at least on the street side, and that vehicles used that setback instead.) A variety of neighbors complained, via affidavit, about noise, vibrations, and dust that resulted from the process of moving and compacting metal. The township's supervisor, Steve Steinhauser, served as a mediator at three meetings at which representatives of Plaintiff and Defendant county, as well as neighbors, attended.

B.

After those efforts at conciliation failed, Defendant county sought injunctive relief in state court in January or February 2004. Plaintiff countersued.

On December 2, 2004, with that litigation still pending, Defendant county's planning

commission held a special meeting. There, after taking public comment,[5] the commission unanimously voted to add a condition to Plaintiff's special use permit that no metal could be stacked or stored on the ground outside its building. Based on letters exchanged between counsel for Plaintiff and Defendant county on December 14 and 29, 2004, it appears that Plaintiff and Defendants negotiated a temporary resolution that included dismissing the state court litigation without prejudice. In return, Plaintiff would not appeal the planning commission's determination that no scrap be stored on the ground overnight. (Plaintiff attempts to depict Defendant Derocher's characterization of the effect of the parties' agreement to a stipulated dismissal in state court, as described in an undated local newspaper article, as evidence that Defendant county knew that reduced output would effectively cripple Plaintiff's business.)

On April 12, 2005, Defendant Derocher sent Plaintiff a cease and desist letter. The following day, the Ogemaw County Circuit Court granted Plaintiff a temporary restraining order to permit it to pursue its administrative remedies. On April 20, 2005, Plaintiff appealed the cease and desist letter to Defendant county's zoning board of appeals (ZBA).

On June 9, 2005, Defendant county's ZBA determined that Plaintiff had continuously violated the zoning ordinance (1) due to the noise, dust, and vibration from Plaintiff's operations;[6]

---

[5] Plaintiff asserts, without any discernible basis in the record, that Defendant county's planning commission met in a closed session without an official record. Plaintiff cites to an exhibit to Defendants' brief, but that exhibit is an affidavit from a neighbor complaining about noise.

[6] Section 2.9 of the CZO provides:

Every use shall be so conducted and operated such that it is not obnoxious or dangerous by reason of heat, glare, dust, noise, vibration or odors beyond the lot on which the use is located.

[Dkt #19-3].

and (2) because Plaintiff operated on too small a lot for a junk or salvage yard.[7]

In August 2005, Defendants assert (albeit without record citation) that the state court reversed the cease and desist order because of a lack of notice to Plaintiff. According to Plaintiff's complaint (also without record citation), the state court reversed that order on October 17, 2005.

C.

On October 18, 2005, a representative of Plaintiff sought Defendant Derocher's approval, as the representative of the relevant zoning authority as required by a state form,[8] to renew Plaintiff's vehicle dealer's license from the state. According to the notice regarding renewal of that license, "[r]enewal applications will not be accepted after December 31. Application for a new original license will be required if your renewal application is not received by December 31." Pl. Supp'l. Br., Ex. A [dkt #28-2]. The notice concluded with an alert that dealers without renewed licenses by January 1 were not permitted to conduct business. *Id.*

On October 21, 2005, Defendant Derocher issued Plaintiff a "30-Day Notice of Zoning Violations," which warned Plaintiff that it had 30 days to correct violations, else a stop work order would issue. The notice cited Plaintiff for insufficient setbacks for the front and rear yards.[9] The

---

[7]The ZBA decision provides no citation to the CZO for the basis of this violation, although it gives the impression that some part of the county zoning ordinance may address this point.

[8]In their supplemental brief, Defendants contend that Plaintiff presented Defendant Derocher with a form appropriate to a township, rather than for a county. Upon comparison, however, it appears that Plaintiff used the correct form.

[9]Section § 14.4 of the CZO, in relevant part, provides:

    The following dimensional requirements shall be met for any use in this district, unless otherwise provided:
    (C)    Front yard: The minimum front yard setback in this District shall be fifty (50) ft. No parking area, except for driveways, shall be located within twenty (20) ft. of the right-of-way line. This required parking setback area shall be planted

notice also cited Plaintiff for storing materials or equipment in a yard or parking area.[10]  Citing to Chapter 17 of the CZO, the notice also required Plaintiff to comply with its site plan, as approved by the planning commission, in order to operate within its special use permit.  According to the notice, Plaintiff had an additional storage bin and storage bins at an improper location, in contrast to its site plan.  Finally, the notice cited Plaintiff for dust, noise, vibration and odors, in violation of CZO § 2.9.

>CZO § 19.5 provides:
>
>The Planning Commission may revoke a Special Land Use approval, or take any other action allowed by law, if the applicant fails to comply with any of the applicable requirements in this Chapter, any conditions placed on the approval by the Planning Commission, or any other applicable provisions of this Ordinance.  Prior to revoking a Special Land Use approval, the Planning Commission shall conduct a public hearing and give notice of such a hearing in accordance with Section 19.2 B.

---

and maintained as a landscaped yard.
    (D)    Rear yard: The minimum rear yard setback in this District shall be thirty (30) ft.; provided that where a rear yard abuts any Residential District, a minimum of twenty (20) ft. of such setback area shall contain a landscaped buffer composed of evergreen trees or a fence suitable to provide visual screening from adjacent property and shall not be paved or used for parking, loading, vehicle maneuvering, or storage.

CZO § 14.4 [dkt #19-3].

[10]Although the notice referred to CZO § 19.7(M)(5) (which states that open air businesses have specific special land use conditions), CZO § 19.7(U)(5), regarding junk or salvage yards, provides:

>Stored materials shall not be placed outside the required fenced or screened area and shall be stored in a manner so as not to be visible from adjoining properties or rights-of-way.  In no case shall salvage or junk be stored at a height exceeding the height of the storage area fence or screen.

[Dkt #19-3].

[Dkt #19-3].

On October 24, 2005, Defendant Derocher denied approval on Plaintiff's vehicle dealers' license based on his determination that the location was not properly zoned. On November 2, 2005, Plaintiff appealed to Defendant county's ZBA. In its appeal, Plaintiff maintained that the denial of its license application stemmed from an attempt to force it to shut down. Plaintiff stated that, in light of its willingness to agree not to operate until resolution of the contested zoning issue, Defendant county had no rational reason to deny the application to renew its dealers' license. According to Plaintiff's vice president's affidavit, Plaintiff could not have continued as an economically viable operation without that license. The appeal was set for hearing on December 7, 2005.

In their supplemental brief, Defendants state that the township published its new zoning ordinance, West Branch Township Zoning Ordinance (TZO) on November 18, 2005. Despite their citation to a summary of contents of the TZO and the TZO itself, the Court cannot discern any date for its enactment.[11] TZO § 1.6 provides that the ordinance becomes effective eight days after its publication. If Defendants are correct about the date of the adoption of the TZO, it would have become effective on November 26, 2005. The then-applicable state law provided, "A township in which an ordinance enacted under the [T]ownship [Z]oning [A]ct, [(TZA), Mich. Comp. Laws §§ 125.271 *et seq*.,] is in effect is not subject . . . to an ordinance, rule, or regulation adopted under [the County Zoning Act (CZA), Mich. Comp. Laws §§ 125.201 *et seq*.]." Mich. Comp. Laws § 125.239 (repealed by 2006 P.A. 110).[12]

---

[11]Nor did recourse to the township's website, from which Defendants may have gleaned the TZO, provide any further information, from which the Court might take judicial notice.

[12]Defendants also cite to former Mich. Comp. Laws § 125.297, which apparently provided that an ordinance enacted under the TZA – in a county that had a separate zoning ordinance under

-11-

On November 22, 2005 Defendant county voted to transfer zoning authority to the township. In his deposition, the township's supervisor confirmed the fact of that transfer. He stated in his deposition and in an affidavit, however, that the township became the zoning authority on December 16, 2005. These statements appear to conflict with Defendants' assertion, offered without record citation, that the TZO was enacted on November 18, 2005 and effective on November 25, 2005.

The TZO also allows non-conforming uses. TZO § 3.4 provides that a structure or use – lawful on the effective date of the ordinance but unlawful under the ordinance itself – may continue, subject to certain conditions not applicable here. *See also id.* at § 3.1.

On November 29, 2005, Defendant Derocher issued a stop work order to Plaintiff. Relying on CZO § 21.1(5)(a), Defendant Derocher ordered Plaintiff to stop all operations that violated the noise/dust/odor provision of the county zoning ordinance, including halting operating heavy equipment, operating equipment or vehicles that produce more noise or exhaust than would be reasonable on a roadway, and dumping scrap in bins or on the ground in such a manner that causes noise or vibration.

That same day, Plaintiff appealed the cease and desist order to Defendant county's ZBA.[13] The appeal form on this issue, unlike Plaintiff's appeal of the denial of its dealer's license, does not reflect a date on which the matter is set for hearing. In this appeal, Plaintiff objected that Defendant Derocher's determination sought to override the previously issued special use permit, as the uses

---

the CZA – would not be subject to the county's zoning ordinance. 1996 P.A. 569 repealed this statute and, so, was not effective at the time of the instant events.

[13]Pursuant to Mich. Comp. Laws § 125.222 and CZO § 20.3(C), an appeal from a county zoning decision operates as an automatic stay, barring emergency circumstances. (2006 P.A. 110 repealed Mich. Comp. Laws § 125.222.)

objected to were those noted when the permit issued. Plaintiff also contended that Defendant Derocher relied on the subjective complaints of Plaintiff's neighbors, rather than objective criteria.

On December 7, 2005, Defendant county's ZBA met and addressed Plaintiff's appeal(s), which was/were tabled for Defendant county to obtain legal counsel. Based on the unofficial minutes of the meeting, it appears that both of Plaintiff's appeals (the denial of the dealer's license and the issues that prompted the stop-work order) received attention.

On December 8, 2005, Plaintiff's counsel sent a letter to an attorney who may have represented Defendant county regarding the appeal.[14] In that letter, Plaintiff's counsel notes the limited time to renew the dealers' vehicle license (before December 31) and responds to concerns from the prior night's hearing that Plaintiff would not expand its operations with a renewed license.

In a separate letter from that same date to Defendant county, Plaintiff's counsel seeks confirmation that Defendant county no longer has jurisdiction over the matter, as of November 22, 2005, and that the township now has the relevant zoning authority. If that condition has obtained, then Plaintiff sought to remove its appeal from Defendant county's ZBA's agenda for the upcoming month, which Defendant county confirmed in a later letter. (Subsequently, on January 4, 2006, Plaintiff's counsel appeared at a meeting of Defendant county's ZBA and requested that the appeal be withdrawn because the township had jurisdiction.)

In a letter of December 14, 2005, attorney Richards, possibly writing in the capacity as Defendant county's counsel, advised the township board members of the status of Defendant county's dealings with Plaintiff. First, he states that Defendant county loses jurisdiction over

---

[14]The exact relationship of the letter's recipient, Darris Richards, to Defendant county is not clear and that lack of clarity receives some discussion in the letter.

disputed issues with Plaintiff as of the effective date of the TZO, which he describes at December 16, 2005. He states that "as of December 16, 2005 your township is responsible for enforcing any violations of the zoning ordinance [by Plaintiff] existing or in the future." Pl. Am. Cplt., Ex. F [dkt #13-8]. He recites the chronology of the 30-day notice, Plaintiff's response, and a hearing before the ZBA that determined certain violations by Plaintiff. He adds, "Due to the current state of this matter with the change in jurisdiction no action has been taken on these violations." *Id.* Next, he describes a noise/dust/vibration violation subject to a stop-work order that was stayed pending Plaintiff's appeal. He also advises of the issue regarding the denial of the vehicle dealer's license, Plaintiff's appeal, the tabling of that appeal, and the timing concerns for Plaintiff on that issue. He notes that he explored the possibility of granting Plaintiff a temporary zoning change, conditioned on a move, but that a state official advised that that would not be permissible. He concludes with his opinion that Plaintiff's current operation would not be permitted based on its zoning under the TZO and advises that the township may wish to seek legal counsel.

On December 19, 2005, the township's supervisor approved Plaintiff's dealer's vehicle license as in compliance with local zoning. Apparently contemporaneously, the township subjected that approval to Plaintiff's agreement to a number of conditions, including relocation to another property. Plaintiff insists that Defendants' conduct forced it to accept this option of negotiating with the township to continue operations while constructing a new facility, rather than starting a new operation in a different location. In its complaint, Plaintiff asserts that relocation required the investment of nearly $777,000 in the new site.

On May 25, 2006, Plaintiff filed suit, alleging a violation of 42 U.S.C. § 1983, based on

purported violations of due process and equal protection (counts I, IV, and V).[15] In its allegations regarding count V for an equal protection violation, Plaintiff also adds the novel legal claim of "a 'taking' in contravention of Plaintiff's Fourteenth Amendment rights." Pl. Am. Cplt. ¶ 65. In Plaintiff's response, it withdraws its claims based on violations of 42 U.S.C. § 1985 (count II) and 42 U.S.C. § 1986 (count III). In light of the outline of the relevant law above, Plaintiff's claims appear to rest on purported impropriety in Defendant county's denial of its renewal application for its vehicle dealer's licence and the unavailability of review of Defendant county's stop-work order and, possibly, of the license denial.

III.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the

---

[15]In the interest of accuracy, counts IV and V of Plaintiff's complaint do not allege violations of § 1983, but only violations of the Fourteenth Amendment, despite the fact that the U.S. Constitution does not provide for private rights of action. Count I advances a claim of a violation of § 1983, but does not specify what constitutional right is at issue.

substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

IV.

Applying the summary judgment standard to Plaintiff's claims of takings, due process, and equal protection violations, through 42 U.S.C. § 1983, the Court cannot conclude that Defendants are entitled to judgment as a matter of law. The lack of precision in Plaintiff's complaint at to its legal theories, however, arguably did not put Defendants on notice as to the nature of the claims against them.

A.

First, in the event that Plaintiff is asserting that Defendants placed conditions on the renewal of the dealer's license or through the stop-work order that lacked both a sufficient connection to a legitimate state interest and a rough proportionality with the cost of the conditions and the benefits to the public, Defendants have not shown an entitlement to judgment as a matter of law. Applying the factors of *Penn Central*, it appears that Plaintiff might have some basis for a takings claim. To reiterate, *Penn Central* requires a court to consider the following factors: (1) the economic effect of the regulation on a claimant; (2) the extent to which the regulation interferes with investment-backed expectations; and (3) the character of the government action, such as whether the action adjusts public benefits or is a physical invasion.

The economic effect of either the denial of the license or the stop-work order was dramatic. Both would function to deny Plaintiff the economic use of its present operations on the property. Although subsequent negotiation about the use of the property and the scope of the special use permit might have allowed for continuation of its operations, both of Defendant county's challenged decisions would have served to prevent the use of Plaintiff's property for its business, that is, imposing a negative economic consequence on Plaintiff.

Similarly, Defendant county's regulatory actions directly interfered with Plaintiff's investment-backed expectations. The record supports the conclusion that Plaintiff initiated its operations only after securing a special use permit and constructed its facility in light of that permit.

As to the third factor – the character of the governmental action – Plaintiff cannot show and has not suggested a that a physical invasion occurred. While the denial of the license due to purported zoning non-compliance and the stop-work order could have resulted from a re-adjustment of public benefits, such as balancing neighboring propertyholders' interests in quiet and reduced dust and vibrations against the interest of Plaintiff to operate its business. Here, however, Plaintiff had previously secured a special use permit that had previously assessed those same societal concerns. Thus, the character of the government action does not, on its face, show that Plaintiff cannot prevail on some type of takings claim.

Second, Plaintiff might also be asserting that Defendants' actions resulted in a reduction of the value of its property. Yet the Supreme Court's decision in *Lucas,* 505 at 1019, applies only if a regulation requires a propertyholder "to sacrifice *all* economically beneficial uses." Based on the facts as developed by the parties to date, the Court can discern no basis for concluding that *all* economically beneficial uses of Plaintiff's property were foreclosed to it. Neither the denial of the

license nor the stop work order eliminated every beneficial use of the property. Undoubtedly, they limited Plaintiff's use of it to collect, consolidate, and transport recyclable metals. Yet nothing in the record shows that the property had no other beneficial use, which is the standard set forth by *Lucas*. Accordingly, Plaintiff cannot support a takings claim against Defendants under *Lucas*.

B.

Because Plaintiff might be seeking to advance a takings claim under *Penn Central*, Plaintiff must also meet the procedural requirements for a takings claim, as set out in *Williamson*. The record is unclear as to whether Plaintiff pursued the denial of its license or the stop work order to a final decision from the responsible municipal agency. This uncertainty may stem from the ambiguity over what entity had the authority to review Defendant county's actions, and at what time.

By similar reasoning, Plaintiff might also have a claim of a violation of procedural due process, to the extent that it limits its claim to the apparent unavailability of any review procedures. Neither party has addressed whether a zoning decision, subsequently rendered unreviewable by the unavailability of a reviewing body, might constitute a violation of due process. To the extent that a decision-making process is established, the unavailability of that process – after legal proceedings have commenced but not concluded – might well constitute a violation of due process.

C.

In addition to its claims of an illegal taking and of a violation of due process, Plaintiff has asserted a claim of a violation of its equal protection rights. Traditionally, equal protection claims fall into two categories: members of suspect classes, whose claims are subject to strict scrutiny, and economic challenges, which receive review under a rational basis standard. No allegation, to date, supports the conclusion that a suspect class is at issue or that no rational basis exists for an aspect

of the zoning ordinance. One possibility remains, however: that Plaintiff advances a claim as a class of one.

"[E]qual protection claims brought by a 'class of one,' where the plaintiff alleges that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 564 (2005) (citations omitted). The Fourteenth Amendment equal protection clause aims to protect against "intentional and arbitrary discrimination," particularly by government agents acting improperly. *See id.* (citation omitted). "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren*, 411 F.3d at 711(citations omitted); *see also Ross v. Duggan*, 402 F.3d 575, 587 (6th Cir. 2004) (noting that a plaintiff bears the burden of showing that government action "did not rationally further any conceivable public purpose").

Here, Plaintiff has not identified any other persons or entities similarly situated that were differently treated. Nor has Plaintiff provided any evidence that no rational basis supports either the CZO or Defendants' actions. Because a rational basis case places the burden of proof on the plaintiff, rather than a strict scrutiny inquiry which places the burden of proof on the government, Plaintiff has not carried its burden as to its claim of a violation of equal protection. Accordingly, the Court will grant Defendants' motion only as to that claim and dismiss Plaintiff's claim of a violation of 42 U.S.C. § 1983 based on a violation of equal protection.

V.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [dkt #19] is

**GRANTED IN PART** and **DENIED IN PART** and that Defendant's supplemental motion for summary judgment [dkt #31] is **DENIED**. Count V of Plaintiff's amended complaint, a claim of a violation of 42 U.S.C. § 1983 based on an alleged violation of its equal protection rights, is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiff is directed to file, on or before **June 4, 2008**, a second amended complaint that specifies what legal theory or theories, in light of the foregoing discussion of the law governing takings and due process violations, it advances for its claims.

It is further **ORDERED** that the case management and scheduling order is **AMENDED** as follows:

- Expert disclosure, plaintiff **September 26, 2008**;
- Expert disclosure, defendant **October 24, 2008**;
- Discovery cutoff **November 28, 2008**;
- Deadline for dispositive motions and motions challenging experts **December 31, 2008**;
- Pretrial disclosures under Rule 26(a)(3) **February 27, 2009**;
- Deadline for motions *in limine* **March 31, 2009**;
- Joint final pre-trial order & draft joint jury instructions deadline **April 14, 2009**;
- Final pre-trial conference **April 21, 2009** at 2:30 p.m. and
- Trial **May 5, 2009** at 8:30 a.m.

The balance of the case management and scheduling order remains in full force and effect.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 21, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 21, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS